**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LYDIA G. MAGALLANES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05 C 4626 |
| v. | ) | |
| | ) | The Honorable William J. Hibbler |
| ILLINOIS BELL TELEPHONE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lydia Magallanes brings this suit against her former employer, Defendant Illinois Bell Telephone Company under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111, *et seq.*, and under Illinois state law. Magallanes claims national origin discrimination and retaliation under Title VII, pointing to the company's failure to promote her, as well its decision to discipline and eventually terminate her. She also claims that these actions constituted discrimination on the basis of age and disability. Finally, she claims the company discharged her in retaliation for her worker's compensation claim. Illinois Bell now moves for summary judgment. For the following reasons, the Court DENIES the motion as to Count I, and as to the failure to promote claim in Count II. The Court GRANTS the motion as to the discipline and termination claims in Count II, as well as to Counts III through V.

### I. Factual Background

The following relevant facts are undisputed, unless otherwise specified. Magallanes was an employee of Illinois Bell from approximately 1975 through March 3, 2005. (Def. Rule

56.1(a)(3) Statement (hereinafter "Def. St.") ¶ 1.) She was last employed as a Maintenance Administrator. (Def. St. ¶ 1.)

## A. Application and testing for the Marketing Support Specialist position

Most of the events relevant to this case took place in 2003 through 2005. However, a few relevant events occurred in 2001. For one, Magallanes bases her retaliation claims in part on a discrimination charge she filed against Illinois Bell in 2001 with the Illinois Department of Human Rights (IDHR). (Pl. Rule 56.1(b)(3)(C) Statement of Additional Facts (hereinafter "Pl. Add'l St.") ¶ 1.) Secondly, in 2001 Magallanes took and passed the Customer Service Assessment: Core/Service module and the Service Representative Cap, which at the time served as the prerequisites for promotion to the Marketing Support Specialist position. (Pl. Add'l St. ¶ 2.) Illinois Bell offered Magallanes the position in December 2001, but she turned the job down because the company would not pay her relocation costs. (Def. St. ¶ 27.) The parties dispute whether Magallanes also took the Customer Contact Interactive Assessment ("CCIA") at that time. (Pl. Add'l St. ¶ 2; Def. Resp. to Pl. Add'l St. (hereinafter "Def. Resp.") ¶ 4.) Illinois Bell had a policy of keeping an employee's test scores on file for five years unless the test changed. (Pl. Add'l St. ¶ 2.)

In May 2003, Illinois Bell changed the prerequisites for the Marketing Support Specialist position, replacing the Service Representative Cap with the CCIA. (Def. St. ¶ 29.) Later that year, Plaintiff applied for that position and took and failed the CCIA. (Def. St. ¶ 31.) Kathy Hale, Illinois Bell's test manager, had no knowledge of Magallanes's prior discrimination complaint when she evaluated her score. (Def. St. ¶ 32.) Magallanes claims that after she failed the test Hale told her that Illinois Bell should not have required that she take the test since she had already qualified for the job in 2001. (Pl. Add'l St. ¶ 4.) Illinois Bell disputes this claim,

claiming instead that Hale informed Magallanes that she did not have to take the Customer Service Assessment: Core/Service module because she had already passed it in 2001. (Def. Resp. ¶ 4.) Illinois Bell did not offer the position to Magallanes. (Def. St. ¶ 31.) The company claims that its decision was based on the fact that Magallanes was automatically disqualified for the position when she failed the CCIA. (Def. St. ¶ 31.) Magallanes disputes that claim. (Pl. Resp. to Def. St. (hereinafter "Pl. Resp.") ¶ 31.) She claims that Illinois Bell denied her the Marketing Support Specialist position because of her national origin and in retaliation for her 2001 discrimination charge.

Illinois Bell gave the Marketing Support Specialist position that Magallanes applied for in 2003 to Brent Harney. (Pl. Add'l St. ¶ 6.) Harney is not of Mexican national origin, nor has he made any internal or external complaints or claims of discrimination against Illinois Bell. (Pl. Add'l St. ¶ 6.)

### B. Attendance, discipline, & termination

Magallanes's also claims that Illinois Bell disciplined and terminated her based on her national origin, her age, her alleged disability, and in retaliation for her 2001 discrimination charge and her request for workers compensation. Illinois Bell counters that it disciplined and terminated Magallanes for excessive absenteeism in accordance with its policies.

### 1. Attendance policy

Following Illinois Bell's attendance rules was an essential function of Magallanes's job. (Def. St. ¶ 6.) Up until early 2004, Illinois Bell used a point system to keep track of absences and the related consequences. (Def. St. ¶ 13.) Then, the company replaced the point system with guidelines laid out in "A Manager's Guide to Administering Consistent Corrective Action Steps." (Def. St. ¶15.) The company also implemented a Mechanized Attendance Tracking Tool ("MATT") to keep track of employee attendance. (Def. St. ¶ 14.) Under the new system, there

were multiple levels or "steps" of discipline. (Def. St. ¶ 18.) Illinois Bell would give an employee a verbal warning after two chargeable absences; a written warning after the third chargeable absence, a one-day suspension after the fourth chargeable absence; a three-day suspension after the fifth chargeable absence; and suspension pending termination after a sixth chargeable absence. (Def. St. ¶ 18.) However, the company would issue a written warning for a "no call, no show" absence even if it was the employee's first chargeable absence. (Def. St. ¶ 18.) The company would advance an employee to the next step of discipline if the employee was already on a step of discipline at the time of a "no call, no show." (Def. St. ¶ 18.) Upon implementation of this system, the Illinois Bell managers met with employees to review their current disciplinary step and the company "rolled back" each employee one step. (Def. St. ¶ 16.)

Illinois Bell requires its employees to provide a medical certification to its FMLA Operations Department in order to obtain approval for leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* (Def. St. ¶ 7.) The certification is due within fifteen days from when the employee is provided a blank certification, although the employee is given a five-day grace period after the stated deadline. (Def. St. ¶ 7.) If the employee fails to submit a complete and sufficient certification, a final denial is issued. (Def. St. ¶ 7.) The final denial notice states that if the denial was due to circumstances beyond the employee's control the leave may be approved if the employee submits the certification and evidence of extenuating circumstances within fifteen days of the final denial. (Def. St. ¶ 8.) The notice also specifically provides that claims of extenuating circumstances brought after fifteen days from the date of the notice will not be accepted. (Def. St. ¶ 8.) Employee supervisors are not involved in the FMLA process and receive no information about any request except that Attendance Managers receive notice from the FMLA Department of its decision to grant or deny a request. (Def. St. ¶ 9.)

4

### 2. Magallanes's attendance

On January 26, 2003, Magallanes was in a car accident that caused her to suffer from a dislocated disc. (Def. St. ¶ 33.) Her back problems subsided by January 2004. (Def. St. ¶ 34.) However, she then fell on Illinois Bell's property in February 2004, and began to experience back pain again. (Def. St. ¶ 34.) Due to physical therapy and medication, however, she has not had any back problems since the summer of 2004. (Def. St. ¶ 36.) Magallanes was absent from work for a significant period of time as a result of the injuries she suffered in the accident and the fall. (*See, e.g.,* Def. St. ¶¶ 33 & 44.) Illinois Bell seems to concede that many of Magallanes's chargeable absences were the result of her injuries and disputes instead whether Magallanes properly obtained permission for her absences.

Magallanes's performance reviews for 2002 and 2003 both stated that she was "below expectations" for attendance. (Pl. Resp. ¶ 46.) In connection with her absences, she received a coaching on September 3, 2002, a counseling on October 25, 2002, and a verbal warning on December 16, 2002. Then, in 2003 she was absent a number of times in connection with her car accident and illness. (Def. St. ¶¶ 39-42, 48-50.) She provided Illinois Bell with FMLA certification and obtained approval for FMLA leave for some of these absences. (Def. St. ¶¶ 39-42.) However, for others, Magallanes admits she did not submit FMLA certification. (Def. St. ¶¶ 49-50.) Magallanes purports to dispute at least one additional chargeable absence in that she believes she met the FMLA requirements. (Pl. Add'l St. ¶ 11.) However, regardless of whether there is a genuine dispute regarding that absence, Magallanes had accumulated more than enough points under the old point system to justify the verbal warning that Illinois Bell gave her on September 25, 2003. (Def. St. ¶ 51.)

On December 1, 2003, Illinois Bell issued another verbal warning to Magallanes for being absent November 24 through 26, 2003. (Def. St. ¶ 52.) The parties dispute whether

Illinois Bell previously approved that absence. (Def. Resp. ¶ 12.) Magallanes requested the time off as vacation time sometime in January 2003 or earlier and Illinois Bell granted the request. (Def. Resp. ¶ 12.) But, the company claims that Magallanes took time off in the interim that invalidated her request. (Def. Resp. ¶ 12.)

Upon implementation of the MATT system in February 2004, Illinois Bell notified Magallanes that it was rolling her back from the verbal warning step to the coaching step. (Def. St. ¶ 53.) On March 11, she committed a "no call, no show" absence. (Def. St. ¶ 55.) While she claimed at the time that she had made a proper request for a vacation day, she admits that she should have checked to see if her request was approved and that she did not. (Def. St. ¶ 55.) On March 15, Illinois Bell issued a written warning for the March 11 absence. (Def. St. ¶ 55.) The company also suspended Magallanes for one day for allegedly falsifying her time sheets when she recorded that she had approval to take March 11 off. (Def. St. ¶ 56.)

Then, on April 29, 2004, the company suspended Magallanes again for an absence on February 12 through 13 stemming from back pain following her fall. (Def. St. ¶¶ 54, 57.) Magallanes did not submit FMLA certifications for those days, despite an extension on the deadline. (Def. St. ¶ 54; Def. Resp. ¶ 15.) While the company claims she was only suspended for one day for this absence, Magallanes claims she was suspended on both April 30 and May 6. (Pl. Add'l St. ¶ 15.) Illinois Bell denies that Magallanes was suspended on April 30, pointing to business records that show that she was paid for that day. (Def. Resp. ¶ 15.)

On May 15, Magallanes was two and a half hours tardy for work because she was mistaken about her schedule. (Def. Resp. ¶ 58.) On May 18, the company suspended her for three days in response.

Magallanes was absent twice in August 2004 as well. First, she was absent from August 11 through 16 due to severe anxiety and panic attacks. (Pl. Add'l St. ¶ 17.) She failed to submit a timely FMLA certification for that absence. (Def. St. ¶ 60.) Her doctor did eventually submit a certification, and Magallanes attempts to dispute whether Illinois Bell received it within the fifteen days following the final denial. (Pl. Add'l St. ¶¶ 17-18.) However, even if it did, her doctor did not provide evidence of any extenuating circumstances until well after fifteen days had passed. (Pl. Add'l St. ¶ 17.) Second, she was absent from August 22 through 25. (Def. St. ¶ 61.) For this absence, she did provide an FMLA certification. (Def. St. ¶ 61.) However, her absence on August 24 was a "no call, no show" absence. (Def. St. ¶ 61.) On September 30, 2004, Illinois Bell issued Magallanes a three-day suspension for her first August absence, but decided not to discipline her for her absence on August 24. (Def. St. ¶¶ 61-62.) Illinois Bell repeated the three-day suspension step of discipline despite the fact that Magallanes was on a termination level since her May suspension. (Def. St. ¶ 62.)

After the September 30 meeting that led to her three-day suspension, a union representative named Lupe Bucio made a report to Magallanes's supervisors, Eugene Olsen and John Nolan, regarding some comments she heard Magallanes make. (Def. St. ¶ 63.) Bucio said that, when speaking about Illinois Bell's enforcement of its attendance policy, Magallanes had stated, "at the rate they are going someone is going to get shot." (Def. St. ¶ 63.) (Def. Resp. ¶ 23.) Olsen and Nolan immediately reported the issue to their Director, Janet Sanford. (Def. St. ¶ 63.) Sanford believed Bucio's report and, after consulting with Human Resources, she suspended Magallanes. (Def. St. ¶¶ 63-64.)

Illinois Bell then conducted an investigation of the incident and offered Magallanes a Back to Work Agreement in lieu of termination in light of her long tenure with the company.

(Def. St. ¶ 65.) Magallanes returned to work on December 1, 2004[1] after serving a suspension totaling 44 days. (Pl. Add'l St. ¶ 24.)

Magallanes was absent from work on January 6 through 7, 2005 because she had the flu. (Def. St. ¶ 66.) She did not qualify for FMLA leave because she had not worked the requisite 1,250 hours in the preceding year. (Def. St. ¶ 66.) Thus, on January 25, Illinois Bell placed her on suspension pending termination. (Def. St. ¶ 67.) The company then terminated her on March 3, 2005. (Def. St. ¶ 69.) At the time, Magallanes was 52 years old. (Def. St. ¶ 24.)

### 3. Workers' compensation claim and charges of discrimination

In addition to the discrimination charge Magallanes filed in 2001, she also filed charges with IDHR on October 23, 2003 and on October 18, 2004. (Def. St. ¶ 71.) She amended the 2004 charge on October 26, 2004 and again on February 9, 2005. (Def. St. ¶ 71.) Beatrice Oshita was a Senior EEO Consultant for Illinois Bell when Magallanes filed her discrimination charges and was responsible for investigating and responding to those charges. (Def. St. ¶ 72.)

Magallanes also filed a workers' compensation claim on or about March 5, 2004. (Def. St. ¶ 70.)

### 4. The statements and actions of supervisors

Magallanes argues that the statements and actions of her supervisors and others at Illinois Bell evidence discriminatory and retaliatory intent. She points to the following undisputed facts in support of her argument.

Katherine Moore was Magallanes's Performance Manager from 2002 through early 2004. (Def. St. ¶ 21.) Eugene Olsen took over that position from February 2004 through August 2004. (Def. St. ¶ 22.) Olsen reported to Bill O'Neill, who became Area Manager in November 2003.

---

[1] Illinois Bell's Local Rule 56.1(a)(3) Statement of Facts states that Magallanes returned to work on December 1, 2005, (Def. St. ¶ 65), and Magallanes admits that statement, (Pl. Resp. ¶ 65). However, given the sequence of events set forth by both parties, it is clear that they intended to state that she returned to work at the end of 2004.

(Def. St. ¶ 22.) O'Neill, in turn, reported to Janet Sanford, who became the Director in December 2003. (Def. St. ¶ 22.) In August 2004, Olsen became Magallanes's Attendance Manager. (Def. St. ¶ 23.) In that position, he reported to Maureen McGreevy, Area Manager, who also reported to Sanford. (Def. St. ¶ 23.)

Attendance Managers would provide information to Performance Managers regarding employee attendance issues. (Def. St. ¶ 25.) Attendance and Performance Managers could issue counseling and warnings (verbal and written) without consulting with their supervisors. (Def. St. ¶ 25.) They would consult with their supervisors before the company would suspend or terminate a Maintenance Administrator such as Magallanes. (Def. St. ¶ 26.)

In December 2003, after Illinois Bell charged Magallanes with absences for November 24 through 26, 2003, Magallanes sent an email to Joe Dimelis, Vice President of Network Services, to complain that she had selected the week as a vacation week in 2002. (Pl. Add'l St. ¶ 13.) Dimelis forwarded the email to Jon Nelson, the former Director of the Customer Service Bureau, who forwarded it to Bill O'Neill and Katherine Moore. (Pl. Add'l St. ¶ 13.) At the end of the email trail that resulted from Magallanes's initial email, Jon Nelson sent an email to Laura Lee and Bill O'Neill in which he stated that Magallanes had a "reputation of causing trouble, including making accusations of racism and unfair treatment." (Pl. Add'l St. ¶ 14.) He also wrote that Magallanes "apparently has also been known for suing the company she works for (and I do believe she has sued [Illinois Bell] in the past)." (Pl. Add'l St. ¶ 14.) Finally, Nelson stated that Magallanes "filed an EEO against Katherine right after she was disciplined for not coming to work for a week." (Pl. Add'l St. ¶ 14.) Nelson left the Director position that same month. (Def. Resp. ¶ 16.) He did not participate in the decision of whether to promote Magallanes or in the decision to terminate her. (Def. Resp. ¶ 16.)

O'Neill and Sanford both testified that they were unaware that Magallanes had filed any discrimination charges until after her termination. (Pl. Add'l St. ¶ 25; Def. St. ¶ 76.) Contrary to his testimony, O'Neill undisputedly became aware of at least some of her claims prior to termination, (Def. Resp. § D), because he attended the fact-finding conference regarding her 2003 failure to promote claim, (Pl. Add'l St. ¶ 26). O'Neill expressed confusion regarding the meaning of the charges or the purpose of the IDHR, however. (Def. Resp. ¶ 26.) O'Neill was the Customer Service Bureau contact for Karen Carroll, the Labor Relations Case Manager that handled the dismissal panel hearing held in connection with Magallanes's alleged threatening remark. (Pl. Add'l St. ¶ 32.) On November 5, 2004, the Customer Service Bureau advised Carroll that Magallanes had filed EEO charges. (Pl. Add'l St. ¶ 32.) However, Carroll did not recall who communicated that information to her. (Pl. Add'l St. ¶ 32.)

Oshita also discussed Magallanes's 2004 charge with both O'Neill and Sanford. (Pl. Add'l St. ¶¶ 28-29.) The record does not reflect when her conversations with O'Neill took place. (Def. Resp. ¶ 28.) Oshita remembers her discussions with Sanford taking place shortly before the May 25, 2005 fact-finding conference. (Def. Resp. ¶ 29.)

On November 19, 2004, after the dismissal hearing resulting from the allegations that Magallanes made a threatening remark, Karen Carroll advised Sanford that she did not believe there was a strong case for termination against Magallanes. (Pl. Add'l St. ¶ 33.) Carroll noted that the labor arbitrators responsible for interpreting the relevant collective bargaining agreement placed a lot of weight on employee seniority. (Def. Resp. ¶ 33.) Nonetheless, Sanford still temporarily considered terminating Magallanes and did not concur with Labor Relations' recommendation to offer Magallanes a back to work agreement until November 29, 2004. (Pl. Add'l St. ¶ 33.) On March 2, 2005, Carroll made the same recommendation to Sanford

regarding terminating Magallanes based on her attendance record. (Pl. Add'l St. ¶ 34.) She once again pointed out that a labor arbitrator might overturn the decision because of Magallanes's seniority. (Pl. Add'l St. ¶ 34; Def. Resp. ¶ 34.) In neither case did Carroll discuss Magallanes's EEO claims with Sanford. (Def. Resp. ¶¶ 33-34.)

## II. Standard of review

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. *Id.* Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The non-moving party must produce specific facts showing there is a genuine issue of material fact, and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Finally, all evidence and inferences must be viewed in the light most favorable to the non-moving party. *Id.* at 255.

## III. Analysis

### A. Title VII

Magallanes brings Title VII claims under two different theories of liability. First, she argues that Illinois Bell denied her promotion to the Marketing Support Specialist position in 2003 because of her national origin. Second, she argues that Illinois Bell denied her that promotion, as well as disciplined and terminated her, in retaliation for her charges of discrimination. A plaintiff may prove a violation of Title VII by the direct method of proof or

the indirect method of proof. *Timmons v. Gen'l Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006). The details of each method as applicable in this case are discussed below.

### 1. Failure to promote due to national origin discrimination

Magallanes seems to concede that she is unable to prove her claim of national origin discrimination by the direct method of proof. Illinois Bell argues that she is similarly unable to prove her claim by the indirect method laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the indirect or "burden-shifting" method, Magallanes must first make out a prima facie case of discrimination. *Timmons,* 469 F.3d at 1126. If she is successful, the burden shifts to Illinois Bell to articulate a legitimate nondiscriminatory reason for failing to promote her to the marketing support specialist position. *Id.* If Illinois Bell can do that, the burden shifts back to Magallanes to show that Illinois Bell's stated reason is simply pretext for discrimination. *Id.* In order to make out a prima facie case of discrimination, Magallanes must prove that she: (1) is a member of a protected class; (2) was qualified for the Marketing Support Specialist position; (3) was rejected for that position; and (4) was treated less favorably than similarly situated employees outside of her protected class. *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 772 (7th Cir. 2006).

Illinois Bell does not dispute that Magallanes is a member of a protected class in that she is alleging discrimination on the basis of the fact the is of Mexican national origin. Neither does the company dispute that the company denied Magallanes the position. However, the company does argue that Magallanes cannot prove the second or fourth prongs of a prima facie case.

Illinois Bell argues that while the company kept test scores on file for five years, and Magallanes did test-qualify for the Marketing Support Specialist position in 2001, the test prerequisites changed in May 2003, when the company replaced the Service Representative Cap with the CCIA. Thus, the company contends, Magallanes was no longer test-qualified for the

position based on her old test scores and she had to take the CCIA in order to qualify. The company therefore believes that its decision not to promote Magallanes was justified by the fact that Magallanes failed the CCIA in 2003. Similarly, the company argues that Magallanes and Harney were not similarly situated because Magallanes failed the prerequisite test and Harney passed it.

There are two problems with Illinois Bell's argument. First, Magallanes states that she took the CCIA in 2001. The company has no record of her taking the test that year and it was company policy to keep such records. However, the company has not submitted evidence that it did not offer the CCIA whatsoever in 2001, so it is possible that Magallanes took the test at that time. Through her testimony, Magallanes has thus created a genuine dispute as to whether she previously test-qualified for the position even under the 2003 prerequisites.

The second issue with Illinois Bell's argument is that Magallanes and Hale, the company's Test Manager, also dispute what information Hale gave Magallanes about the company's policy regarding test prerequisites. Magallanes recalls Hale telling her that she did not need to take the CCIA in 2003 because she had previously qualified for the position. Hale recalls telling Magallanes that she did not need to take the Customer Service Assessment: Core/Service module again because she had previously passed that test, but not that she did not need to take the CCIA. Illinois Bell also replies to Magallanes's argument by stating that it was company policy to require all applicants to take the currently applicable tests in order to qualify for a position unless they were "grandfathered" in by virtue of the fact that they were already in a job that required the CCIA test. However, the only evidence of this policy is Hale's testimony. Since Magallanes states that Hale previously communicated a different policy to her, she creates

a genuine dispute as to whether she was even required to take the CCIA given that she qualified for the position in 2001.

For these reasons, Magallanes has created a genuine dispute as to whether she can meet both the second and fourth prongs set forth above. In turn, she has created a genuine dispute as to whether she can shift the burden to Illinois Bell to articulate a legitimate, nondiscriminatory reason for denying her the promotion. If the burden shifts, Illinois Bell can obviously point to Magallanes's failure of the CCIA as the reason for denying her the promotion. However, given that the Court has already determined that Magallanes has created a genuine dispute as to whether Illinois Bell should have been administering that test according to its own policy, the Court must hold that Magallanes has also created a dispute as to whether this reason was pretext for discrimination. Thus, the Court denies Illinois Bell's motion for summary judgment as to Count I of the complaint.

### 2. Failure to promote in retaliation for protected activity

Magallanes next alleges that she suffered adverse employment actions in retaliation for the various charges of discrimination she filed against the company. First, she argues that this was yet another motivating factor behind the company's decision not to offer her the Marketing Support Specialist position in 2003. Magallanes makes arguments in support of this claim under both the direct method and the indirect method of proof.

Under the direct method, Magallanes must prove that Illinois Bell denied her the promotion as a result of the fact that she engaged in protected activity. *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006). The method is "ordinarily more onerous" for the plaintiff because it requires that a plaintiff prove more than that the employer's proffered reason for taking the adverse employment action is false; the plaintiff must prove that the employer's reason for acting was in fact retaliation. *Id.* at 902. The parties do not

dispute that Magallanes engaged in protected activity each time she filed a charge of discrimination. Thus, the only question is whether Magallanes has presented sufficient evidence to create a dispute as to whether Illinois Bell's decision not to promote her was a result of her engaging in that activity. Despite some confusion in the case law and in the briefs in this case, the Seventh Circuit has made clear that a plaintiff may prove her claim under the direct method using either direct or circumstantial evidence, or both. *Id.* at 902-03. In this case, Magallanes attempts to rely on circumstantial evidence alone.

Magallanes points first to the email Jon Nelson sent to Laura Lee and Bill O'Neill later in 2003, after the company denied Magallanes the promotion, in which he stated that Magallanes "had a reputation of causing trouble, including making accusations of racism and unfair treatment." Magallanes admits Nelson played no role in the decision and she does not suggest that Lee or O'Neill played any role in the decision either. She also admits that Illinois Bell offered her a Marketing Support Specialist position just months after she filed and amended her 2001 discrimination charge, but she rejected it. Additionally, it is undisputed that Kathy Hale, the Test Manager, was unaware of Magallanes's discrimination charge at the time she found Magallanes to be unqualified. Instead, she argues that the email is evidence of Magallanes's reputation within the company around that time – a reputation that may have "infected the decision making process concerning the denial." She contends that this evidence, when considered in conjunction with the evidence outlined above concerning pretext, at least establishes a dispute as to whether there was a causal connection between her 2001 discrimination complaint and the company's decision not to offer the Marketing Support Specialist Position.

The Court disagrees. Workplace comments such as Nelson's might provide circumstantial evidence of the motivation behind an employer's decision, even if they are not directly related to the employment decision in question. *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) (addressing evidence submitted in support of claim of pretext under the indirect method). But, "the less direct the connection between the comment and the employment action – that is, if the comment was not made in temporal proximity to the employment action, or if the comment was not made in reference to that action – the less evidentiary value the comment will have." *Id.* In this case, the record is devoid of evidence tying Nelson's email to any aspect of Illinois Bell's decision not to offer Magallanes the Marketing Support Specialist position. The comment appears to be a "stray" remark unrelated to the decision in time or substance. *See id.* Thus, while Magallanes may have put forward enough evidence to call into question whether the reason offered by Illinois Bell is pretext, the email is not sufficient to support the affirmative conclusion that Illinois Bell acted with retaliatory intent. In other words, no reasonable jury could find in Magallanes's favor on the basis of reasonable inferences from this evidence. Thus, her claim fails under the direct method.

Nonetheless, Magallanes may proceed on her retaliation claim regarding Illinois Bell's failure to promote her under the indirect method for all of the same reasons she may proceed on her claims of national origin discrimination. The only element that differs slightly from those discussed above is the requirement that Magallanes show that similarly situated employees were treated more favorably. However, because Brent Harney, the man who took the position, did not file any charges of discrimination, Magallanes meets that requirement in her retaliation claim as well.

### 3. Discipline and termination in retaliation for protected activity

#### a) Direct method

Magallanes makes a similar argument to the one discussed above for why she should be able to proceed under a direct method of proof on her claim that Illinois Bell disciplined and terminated her in retaliation for her charges of discrimination. She once again relies on circumstantial evidence. And once again, she points first to Nelson's email. However, her discussion of the email varies slightly because of O'Neill's involvement in her discipline and she points to a couple other pieces of evidence that she believes are supportive of her claim.

In her argument, Magallanes focuses on the fact that O'Neill was a recipient of Nelson's December 2003 email. This is important, she claims, because O'Neill did play a role in disciplining Magallanes for her attendance violations and those disciplinary actions eventually culminated in her termination (although O'Neill was not directly involved in the decision to terminate her). Thus, she believes this email provides even stronger support for her claim concerning discipline and termination than it does for her claim concerning the failure to promote because it provides better evidence that her "reputation" as Nelson perceived it infected the decision making process. While this may nudge the email slightly more towards the probative end of the evidentiary spectrum, it does not do much more than that. The comment was not made in relation to the decision to discipline or terminate Magallanes. Nor was it temporally related to many of the actions complained of here. But most importantly, it was not made by someone involved in the decision making process.

Magallanes adds that this email is also further evidence of a fact that Illinois Bell already concedes: that despite his testimony to the contrary, O'Neill was actually aware of Magallanes's

charges of discrimination prior to her termination.[2] Magallanes argues that O'Neill's false testimony is evidence that he attempted to cover up the real, retaliatory reason for disciplining Magallanes. However, Magallanes's "cover-up" theory is belied by the fact that O'Neill admitted attending the IDHR fact-finding hearing. He testified that he did not understand that the hearing related to a discrimination charge. Magallanes thus proposes that a reasonable jury could make the following series of inferences: first, that O'Neill admitted knowledge of the charges but lied about his understanding of those charges; second, that he did so because the reasons he gave for disciplining Magallanes were pretext; and third, that Sanford's decision to terminate Magallanes was the result of pretextual disciplinary decisions made by O'Neill. Most importantly, Magallanes proposes that a reasonable jury could extrapolate from those findings that not only were O'Neill's reasons pretextual, his real motivation for disciplining Magallanes was retaliation for filing her discrimination charges. Without further evidence of retaliatory intent, the Court finds Magallanes's proposed series of inferences to be unreasonable.

Magallanes also rests her claim on the fact that Sanford went against the recommendations of the Labor Relations Department when she finally made her decision to terminate Magallanes. Given that Magallanes has provided no evidence that Sanford was aware of any discrimination charges prior to making her decision to terminate Magallanes, this evidence does not support Magallanes's claim. But, even assuming that Sanford did know of the charges, if Illinois Bell properly progressed Magallanes through the disciplinary process for absences, then Sanford actually declined to terminate Magallanes on at least two previous occasions when she was eligible for termination. First, she gave her a second three-day

---

[2] Magallanes attempts to argue that Sanford was also aware of the charges prior to making the decision to terminate her, but the only evidence showing that Sanford became aware of the charges is testimony by Oshita that she discussed the charges with Sanford shortly before the May 25, 2005 fact-finding conference that followed Sanford's decision.

suspension in a row for absences when the MATT system called for termination for an absence following a three-day suspension. Second, she offered her a back to work agreement on the recommendation of the Labor Relations Department after Bucio alleged that Magallanes made a threatening remark. Thus, Sanford's decision not to heed the advice of the Labor Relations Department and extend yet another opportunity to Magallanes due to her seniority would be weak evidence that Sanford's purported reason for firing Magallanes was pretextual, let alone that Sanford's real motivation was retaliation.

This last point highlights what is perhaps the most important question in this case, however, which is whether Illinois Bell did in fact properly progress Magallanes through the disciplinary steps of the two attendance systems. If Magallanes can create a genuine dispute as to whether she was treated unfairly under those systems, then her case may be strong. Unfortunately for Magallanes, she does not fare well on this point either.

By September of 2003, Magallanes accumulated 9 points under the earlier point system for measuring absenteeism and issuing discipline. She admits that she failed to get any FMLA certification for some of the absences leading up to that accumulation. Thus, these absences were properly chargeable under Illinois Bell's policy. She argues that she did meet the FMLA requirement for at least one of her charged 2003 absences. However, even assuming that she has actually created a dispute regarding that absence, she accumulated more than enough points to justify the verbal warning that Illinois Bell gave her on September 25, 2003.

Then, she was charged with an absence on November 24 through 26 for taking vacation without approval. Magallanes argues that she had approval for the vacation time and Illinois Bell counters that she took off other days that negated that approval. Nonetheless, Illinois Bell only issued a verbal warning for that absence. Thus, even assuming that the absence was not

chargeable, the discipline issued did not affect Magallanes's disciplinary step when Illinois Bell implemented the MATT system a couple months later.

Thus, while Illinois Bell could have arguably subjected Magallanes to far more discipline than it had by the end of 2003, she began 2004 at the verbal warning step of discipline. As a result, Illinois Bell rolled her back to the coaching step when it implemented the MATT system. Then, on March 15 the company disciplined her for a March 11 "no call, no show" absence. The company followed its policy and immediately issued Magallanes a written warning.

The company also issued Magallanes a one-day suspension for falsifying her time sheets because she recorded the day as approved vacation time. Magallanes admits that she should have checked with her employer before she took the day off. But even if the one-day suspension was too harsh or unwarranted, it does not appear that Illinois Bell considered it as an additional disciplinary step so far as Magallanes's absenteeism was concerned because the next time the company issued discipline for an absence, it once again issued a one-day suspension.

The company issued that suspension for Magallanes's Feburary 2004 absences. Magallanes admits that she did not submit FMLA certifications for those dates. However, she claims she served two one-day suspensions for the violation instead of one. While Illinois Bell does provide payroll records that show that Magallanes was paid for one of the days she believes she was suspended, she has created a dispute as to whether she was suspended that day. Nonetheless, she does not claim that the alleged extra day of suspension affected her progression through the MATT system steps of discipline in any way.

Illinois Bell next issued Magallanes a three-day suspension for her tardiness on May 15, 2004. Magallanes provides no legitimate challenge to this action.

On September 30, 2004, the company issued another three-day suspension for Magallanes's absences on August 11 through 16. While Magallanes did eventually submit FMLA certifications for those dates, she admits they were untimely. She attempts to dispute whether Illinois Bell received it within the fifteen days following the company's final denial. Even assuming she has actually created a dispute as to that issue, however, her doctor did not provide evidence of any extenuating circumstances until well after fifteen days had passed. Thus, under Illinois Bell's policy, her denial remained final. While such strict enforcement of FMLA deadlines may seem harsh, the Seventh Circuit has upheld an employer's right to apply such deadlines in a similar case where the employee failed to provide proper and timely evidence of extenuating circumstances justifying untimeliness. *Townsend-Taylor v. Ameritech Servs., Inc.*, 523 F.3d 815, 818 (7th Cir. 2008) (quoting *Urban v. Dolgencorp of Texas, Inc.*, 393 F.3d 572, 577 (5th Cir.2004)) (noting that to hold otherwise would undermine the concept of a deadline and unduly impinge on the legitimate business interests of employers). Moreover, the company merely repeated a step of discipline already imposed on Magallanes once before. Finally, the company also declined to issue any discipline for a "no call, no show" absence on August 24 because Magallanes did have a certification for that absence.

Then, on January 6 and 7, just a month after returning to work on a back to work agreement, Magallanes was absent again. She was no longer eligible for FMLA leave because she had not worked the requisite 1,250 hours during the preceding year. *See* 29 U.S.C. § 2611(2)(A)(ii). This time, Illinois Bell moved on to the next step of discipline under the MATT system and terminated Magallanes. Magallanes argues that she only fell below that threshold because of her suspension that resulted from Bucio's allegations. However, given the seriousness of Bucio's allegations, there is no reason to question the legitimacy of that

suspension. Moreover, she provides no evidence supporting the proposition that the suspension did in fact cause her failure to meet the hours requirement. Finally, the Seventh Circuit has made clear that the 1,250-hour requirement is a strict one that courts should be hesitant to dilute. *See Bailey v. Pregis Innovative Packaging, Inc.*, 600 F.3d 748, 749-50 (7th Cir. 2010) (collecting cases).

Thus, Illinois Bell properly applied its attendance policy in Magallanes's case. In fact, numerous times the company gave Magallanes the benefit of the doubt and either withheld discipline or repeated disciplinary steps. When the company finally did fire her, Magallanes was eligible for termination under the MATT system.

However, Magallanes still claims that she was treated unfairly because she believes that other employees were treated differently under the policy and believes that that unfair treatment is additional circumstantial evidence of the company's retaliatory intent. However, she presents limited evidence in support of that assertion. In fact, Magallanes fails to describe her evidence in her Local Rule 56.1(b)(3)(C) Statement of Additional Facts. Instead, she merely references the documentation in her Statement, (Pl. Add'l St. ¶ 38), and then describes the conclusions she has made from the documents in her response brief. This is an improper and insufficient method for putting additional facts before the Court. L.R. 56.1(b)(3)(C); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (quoting *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)). However, even taking this evidence into account for the sake of argument, Magallanes has not created a genuine dispute as to whether she was treated differently than similarly situated employees.

Magallanes points to a number of employees with more absences than her that had not engaged in statutorily protected activity and were not fired. Illinois Bell points out first that

some of the employees Magallanes lists, and a number not included on her list, were actually terminated for absenteeism. However, even for those who were not, Magallanes has not provided sufficient evidence that they were similarly situated for a number of reasons. First, many of the absences she references may have occurred prior to implementation of the MATT system. At that time, the company gave quite a bit of leeway to Magallanes, and it is quite possible they may have done the same for others. Second, for those absences that did occur under the MATT system, Magallanes has not established that all of the absences she points to are chargeable since information regarding FMLA requests and absences due to disability may not be reflected in the evidence she provides. Third, she has not established that those employees worked for the same supervisors, which is relevant given the supervisors' apparent discretion in implementing the early steps of discipline under the attendance policy. In short, the question of whether those employees identified by Magallanes are similarly situated is a complex one and Magallanes simply fails to address those complexities.

Even taking every tenuous theory Magallanes offers into account at once, she fails to provide the sort of circumstantial evidence that can support a Title VII claim under the direct method of proof. She fails to create a genuine dispute as to whether the company acted with retaliatory intent when it disciplined and terminated her.

### b) Indirect Method

Magallanes also attempts to proceed under the indirect method. As laid out above, in order to do so she must first set forth a prima facie case of discrimination. In this context, she must prove that: (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Moser v. Ind. Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). Obviously, only

the second and fourth prongs are at issue here. However, given the analysis above, it is clear that Magallanes cannot meet these prongs. Her excessive absenteeism stemming back to at least 2002 provided an ample basis for termination under Illinois Bell's policies. As previously noted, even in instances where she seems to take issue with those policies, the FMLA law regarding deadlines and eligibility is not on her side. Moreover, Magallanes has not created a genuine dispute as to whether the company treated her less favorably than similarly situated employees that did not file discrimination charges.

Magallanes argues that in this case the second prong should merge with the pretext question, relying on the holding in *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006), that "if the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same – whether the employer is lying." However, Magallanes does not directly dispute what Illinois Bell's attendance policies were. In fact, she admits almost all of the facts that Illinois Bell sets forth about those policies. Her only argument on this point is that Illinois Bell did not strictly enforce its policies with regard to other employees as it did in her case. For the same reasons that Magallanes cannot satisfy the fourth prong of her prima facie case, this argument also fails. Magallanes does not adequately dispute Illinois Bell's assertion that it applied its policies fairly.

Thus, Magallanes may not proceed on her Title VII claim regarding her discipline and termination under the indirect method of proof either. The Court therefore grants Illinois Bell's motion for summary judgment on that claim.

### B. ADEA

Magallanes only attempts to proceed under the indirect method on her claim under the ADEA that Illinois Bell disciplined and terminated her because of her age. The Supreme Court

24

recently noted that it has never definitively decided whether the indirect method of proof applicable in Title VII cases also applies to ADEA claims. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2349 n.2 (2009). The Seventh Circuit, on the other hand, has long applied the indirect method of proof to ADEA claims, *see, e.g., Faas v. Sears, Roebuck, & Co.*, 532 F.3d 633, 641-42 (7th Cir. 2008), and apparently continues to do so even in the wake of *Gross, see, e.g., Gacek v. American Airlines, Inc.*, No. 09-3131, --- F.3d ---, 2010 WL 2780318, *5 (7th Cir. July 15, 2010) (noting that the indirect method is applicable to all federal discrimination law, not simply Title VII cases); *Mach v. Will County Sheriff*, 580 F.3d 495, 498 n. 3 (7th Cir. 2009); *Guinto v. Exelon Generation Co., LLC*, 341 Fed. Appx. 240, 245 n.2 (7th Cir. 2009) (applying the indirect method, but noting that both parties assumed the method was applicable); *but see Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010) ("[w]hether such a burden shifting analysis survives the Supreme Court's declaration in *Gross* in non-Title VII cases, remains to be seen"). *Gross* nonetheless impacts the plaintiff's burden of proof in ADEA claims by requiring them to show that age discrimination was the "but for" cause of the adverse employment action, not merely one of the motivating factors. 129 S. Ct. at 2350-51. For all of the reasons discussed above – most notably that she was not meeting Illinois Bell's legitimate business expectations – Magallanes cannot prove that her age was even one of a number of causes of her discipline and termination under the indirect method, let alone the "but for" cause. The Court therefore grants Illinois Bell's motion for summary judgment on her ADEA claim.

### C. ADA

Magallanes also claims that she was discriminated against because she was disabled as a result of her car accident and fall. In order to make out a prima facie case of discrimination under the ADA, Magallanes must show that she: (1) suffers from a disability as defined by the statute; (2) is qualified to perform the essential functions of the job in question, with or without

reasonable accommodation; and (3) suffered an adverse employment action as a result of her disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). The parties engage in argument on all three factors, but the Court only addresses the second factor because it is dispositive in this case. Magallanes admits that following Illinois Bell's attendance rules was an essential function of her job. Thus, Illinois Bell contends that Magallanes was apparently unable to perform this essential job function. Magallanes does not respond by claiming that she could have followed the rules if she had been granted a reasonable accommodation. Instead, she simply refers the Court to her previous arguments for why Illinois Bell should not have charged her for certain of her absences. As detailed above, the Court rejects those arguments. Thus, the Court grants Illinois Bell's motion for summary judgment on her ADA claim as well.

### D. Retaliatory Discharge

Magallanes's final claim is a claim for retaliatory discharge under Illinois law. In other words, Magallanes alleges that Illinois Bell terminated her in retaliation for the workers' compensation claim she filed in March 2004. In order to succeed on such a claim, Magallanes must show that she exercised her rights under the Illinois Workers' Compensation Act, that she was discharged, and that there was a causal connection between the claim and the discharge. *Dotson v. BRP U.S. Inc.*, 520 F.3d 703, 707 (7th Cir. 2008). The only element under dispute in this case is causation.

Magallanes points to only two pieces of evidence that she believes support her claims of causation. First, she points again to what she views as unfair discipline shortly after she filed her claim. As the court already held, however, Illinois Bell did not act unfairly when it disciplined Magallanes for her attendance issues. The fact that her absences were linked to a compensable injury does not change anything because "an employer may fire an employee for excess absenteeism, even if the absenteeism is caused by a compensable injury." *Id.* (internal quotation

omitted). Second, Magallanes argues that Sanford's decision to terminate her despite the recommendation of the Labor Relations Department is further evidence of the company's retaliatory intent. The Court addressed this theory above. Magallanes does not set forth enough evidence to put the issue of causation into dispute. Thus, the Court grants Illinois Bell's motion for summary judgment as to her retaliatory discharge claim as well.

### CONCLUSION

For the above reasons, the Court: DENIES Defendant's motion for summary judgment as to Count I, and as to the failure to promote claim in Count II; and GRANTS the motion as to the discipline and termination claims in Count II, as well as to Counts III through V.

IT IS SO ORDERED.

_7/22/10_
Dated

Hon. William J. Hibbler
United States District Court